1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

ROBERT SESMA,

Civil No.        07-0539-WQH (JMA)

11

Petitioner,

12

vs.

**REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS**

13

ROBERT J. HERNANDEZ, Warden,

Respondent.

14
15
16

**I.      INTRODUCTION**

17

        Robert Sesma ("Sesma") is a California prisoner serving a sentence of seven years to life,  with

18

the possibility of parole, for first and second degree murder.  He has filed a Petition for Writ of Habeas

19

Corpus pursuant to 28 U.S.C. § 2254 challenging the November 7, 2005 decision of the Board of Parole

20

Hearings ("BPH")[1] denying him parole.   [Doc. No. 1]   This Court has reviewed the Petition,

21

Respondent's Answer, the Traverse, and all supporting documents.  [Doc. Nos. 1, 4 & 5]  After a

22

thorough review of the record, the Court finds that Petitioner is not entitled to the relief requested and

23

**RECOMMENDS** that the Petition be **DENIED**.

24

**II.     FACTUAL AND PROCEDURAL BACKGROUND**

25

        The California Court of Appeal, in affirming Petitioner's conviction and judgment as modified,[2]

26

27

        [1]  The Board of Parole Hearings was formerly known as the Board of Prison Terms ("BPT").

28

        [2]  The court modified the judgment as to Petitioner "to provide that execution of the sentence on count IV be stayed pending finality of this judgment and service of sentence on counts I and II, at which time the stay shall become permanent. "  (Lodgment No. 3 at 24.)

07cv0539

summarized the facts of the commitment offenses as follows:

[¶] On or about December 12, 1973, Rue Steele and Vaudra "Butch" Nunley were killed and buried in the backyard of a house rented by defendant Thompson. The house was situated on a lot consisting of approximately two acres in the City of Santa Ana, and was being used by defendant Solis as a transfer point in a large-scale marijuana business. Nunley and defendants Sesma and Thompson performed various functions for defendant Solis, including the transportation of marijuana and the collection of money.

[¶] Sometime prior to the murders, defendant Thompson engaged Randy Pierce to dig a large grave in the backyard of Thompson's residence for the ostensible purpose of burying a large dog. Thompson agreed to pay Pierce $1,000 for this service, which was to be paid out of $5,000 that Thompson was to receive from "the man" for thwarting an alleged kidnap plot against "the man's" wife and children by Butch Nunley. The $5,000 was to be split three ways, $2,000 to Thompson, $2,000 to Sesma, and $1,000 to Pierce. Later the same day, in a telephone conversation between Thompson and Sesma, it was arranged that Sesma would pick up Thompson at his home and the two of them would go to defendant Solis' house where Solis had arranged to have Nunley come to discuss some future marijuana transportation. After Thompson and Sesma arrived at the Solis house, Solis and his family left to attend a movie. The Solis family left the movie early and went to Solis' in-laws' home. Solis called his own house, and then returned home without his family.

[¶] In the meantime victims Nunley and Steele arrived at the Solis house where they were confronted at gunpoint by Sesma and Thompson. Thereupon Sesma proceeded to beat Steele so severely about the head with a shotgun that the gun was broken. Thompson took Nunley into the den and gave him such a severe beating that blood was spattered throughout the room. Thompson and Sesma then loaded the bodies into the trunk of Sesma's Cadillac for the purpose of transporting them to Thompson's house for burial in the grave Thompson had arranged for Pierce to prepare.

[¶] Upon arrival at Thompson's house it was discovered that Nunley was not dead. Sesma then shot him in the head with a .22 caliber pistol. Steele's death was due to subdural hemorrhage caused by the beating, and Nunley's death was due to the gunshot wound. Solis came and checked the bodies before they were buried, and then returned with Sesma to his own residence to remove the truck that Steele and Nunley had driven to the Solis house. Two or three days after the murder Solis paid Thompson approximately $4,800, which was split with Sesma and Pierce. Thereafter, Thompson left the state with Nunley's wife.

(Lodgment No. 3 at 2-4.)

Petitioner had no juvenile criminal history. His adult criminal history prior to the commitment offenses included transporting a stolen vehicle, carrying a concealed knife in a vehicle, and possession of a switchblade. (Lodgment No. 5/Pet., exh. A, Transcript of Subsequent Parole Consideration Hearing held November 7, 2005 ("Hrg. Trans.") at 6.) The commitment offenses occurred on December 12, 1973. On August 29, 1975, Petitioner was convicted of first-degree murder, second-degree murder, and simple kidnaping and, on October 31, 1975, he was sentenced to an aggregate prison term of seven years-to-life with the possibility of parole. The terms for the murder counts were imposed concurrently.

The term for the simple kidnaping count was stayed.  He was committed to prison on October 31, 1975. (Lodgment No. 1/Pet., exh. C, Abstract of Judgment, at 1-6.)  He became eligible for parole on his minimum eligible parole date of November 18, 1981.  (Hrg. Trans. at 1.)

Petitioner alleges, and Respondent does not dispute, that between 1981 and 2002, Petitioner attended nine BPT/BPH parole hearings.  Petitioner was declared unsuitable and denied parole at each hearing based chiefly or entirely on the alleged gravity of his commitment offenses.  (Pet. at 9.) On November 7, 2005, a BPH panel found Petitioner unsuitable for parole for a tenth time, finding that he "would pose an unreasonable risk of danger to society and a threat to public safety if released from prison".  (Hrg. Trans. at 27; Lodgment No. 4, Life Prisoner Hearing Decision Face Sheet.)  On July 19, 2006, Petitioner filed a Petition for Writ of Habeas Corpus in Orange County Superior Court, challenging the BPH's November 7, 2005 decision on constitutional grounds.  (Lodgment No. 6.)  On September 27, 2006, the court denied the petition in a written decision.  (Lodgment No. 7.)  On October 13, 2006, Petitioner filed a Petition for Writ of Habeas Corpus in the California Court of Appeal; that court denied the petition without reasoned decision on November 9, 2006.  (Lodgment Nos. 8-10.)  On November 20, 2006, Petitioner filed a Petition for Review with the California Supreme Court; that court denied the petition without reasoned decision on January 24, 2007.  (Lodgment Nos. 11-13.)  Petitioner then filed this federal Petition on March 1, 2007 in the Central District of California.  The Petition was transferred to this district and filed here on March 22, 2007.

**III.     PETITIONER'S CONTENTIONS**

Petitioner challenges the BPH's November 7, 2005 finding that he is unsuitable for parole and contends that:

a) determining Petitioner's parole under the new Determinate Sentencing Law (DSL), rather than under the Indeterminate Sentencing Law (ISL) which was in effect at the time of the commitment offenses, violated the Due Process and Ex Post Facto Clauses of the Constitution (Pet. Ground I);

b) finding Petitioner unsuitable for parole based on the finding that his parole poses "an unreasonable risk of danger to society or a threat to public safety" violated the Due Process Clause and his liberty interest in parole because the BPH's decision and the grounds stated in support of it were (i) supported by no evidence, (ii) inapposite to the record, (iii) inherent in the definition of Petitioner's

-3-

offenses, (iv) irrelevant to his current parole risk, and/or (v) amounted to a conversion of Petitioner's prison term to life without the possibility of parole by the continued preclusion of parole based solely on the unchangeable facts of his commitment offenses and prior criminal record (Pet., Grounds II, III, IV and VI);

c) deferring Petitioner's next parole hearing for an extra year violated due process because it was arbitrary and supported by no evidence of his inability to be parole-suitable after the usual one-year interval (Petition, Ground V).

## IV.  DISCUSSION

### A.  *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997); *see also Redd v. McGrath*, 343 F.3d 1077, 1080 n.4 (9th Cir. 2003) (provisions of AEDPA apply when state prisoner challenges constitutionality of state administrative decision, such as denial of parole); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extremely deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  Additionally, the state court's factual determinations are presumed correct, and Sesma carries the burden of rebutting this presumption with "clear and convincing evidence."  28 U.S.C.A. § 2254(e)(1) (West 2007).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Bell v. Cone*, 535 U.S.

07cv0539

685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying state court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer*, 538 U.S. at 72.

**B.**    ***Whether the Imposition of More Onerous Parole Regulations Violates the Ex Post Facto and Due Process Clauses (Ground I)***

The BPH determined Petitioner's parole unsuitability under the Determinate Sentencing Law ("DSL").  Petitioner argues that, because the DSL statutes and regulations did not exist at the time of Petitioner's offense in 1974 (when the Indeterminate Sentencing Law (ISL) was in effect), the BPH's denial violated his rights under the Ex Post Facto and Due Process Clauses of the United States Constitution.  Petitioner argues that these constitutional violations were prejudicial because the ISL statutes and regulations required his release on parole and discharge therefrom long ago, without a "suitability" prerequisite or a "some evidence' prohibition.  (Pet. at 13-26.)  Respondent argues that because the ISL and DSL both require that an inmate be found suitable before he may be released to

parole, and both guidelines require consideration of identical criteria in determining parole suitability,

application of the DSL guidelines to Petitioner did not violate the Due Process or Ex Post Facto Clauses.

(Mem. of P. & A. in Supp. of Answer at 14-16.)

The Order Denying Habeas Corpus issued by the Orange County Superior Court is the last "reasoned" state court decision regarding Sesma's claims and, thus, will be reviewed here. (Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).) In denying this claim on collateral review, the court stated:

> [¶] Petitioner's offense, conviction and sentencing all occurred under the Indeterminate Sentencing Law (ISL), whereas the determination of his parole suitability has been made under the Determinate Sentencing Law (DSL), which was enacted after his offenses occurred. Petitioner asserts that had he been evaluated for parole under the ISL, he would necessarily have been discharged more than 18 years ago. As a result, he asserts that applying the DSL standards to his case violates the prohibition against ex post facto laws under the United States and California Constitutions.

> [¶] Petitioner relies on a variety of authorities, including *In re Stanworth* (1982) 33 C3d 176, which held that the application of the DSL's parole release consideration standards to a defendant sentenced to life imprisonment under the ISL constituted an ex post facto violation. Finding that the changes were more than procedural, and that they reflected basic legislative alterations in the underlying parole scheme which could work to the defendant's detriment, the California Supreme Court held that the defendant therein was entitled to parole release consideration under both ISL and DSL standards, and was to receive the benefit of the earlier of the two release dates, if any. (*Stanworth*, supra at 188)

> [¶] Nevertheless, despite *Stanworth's* apparent similarity to the present case, it is not controlling because it dealt not with standards of determining parole suitability (which is the issue in the present case) but instead, with the setting of parole release dates (i.e., fixing his term of imprisonment) *after the inmate had already been found suitable for parole*. (*Stanworth*, supra at 178-179) The petitioner in *Stanworth* had been found suitable for parole in 1979, and thereafter successfully objected to the exclusive application of DSL standards in fixing his term and setting his release date (Ibid.). But *Stanworth* did not address whether the use of parole suitability standards under the DSL applied to inmates sentenced under the ISL violated ex post facto principles.

> [¶] However, cases subsequent to *Stanworth* which did address this issue have rejected the precise issue raised herein by petitioner. Two different appellate districts have held that the relevant criteria for determining parole suitability under the ISL was not altered by the enactment of the DSL, and that therefore, no ex post facto principles or equal protection principles were violated by applying DSL standards to prisoners (like petitioner) whose crimes were committed prior to the DSL's effective date. (*In re Seabock* (1983) 140 CA3d 29; *In re Duarte* (1983) 143 CA3d 943). Although more than twenty years old, *Seabock* and *Duarte* have not been overruled and are controlling on this issue. Further, neither *In re Dannenberg* (2005) 34 C4th 1061 at 1082, *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655, nor *Garner v. Jones* (2000) 529 U.S. 244, 120 S.Ct. 1362 affects the applicability of *Seabock* or *Duarte* to the present case. Consequently, petitioner's ex post facto and due process challenges must be denied.

-6-

07cv0539

1    (Lodgment No. 7 at 3-4.)

2        The Ex Post Facto Clause of the United States Constitution prevents the government from

3    retroactively altering the definition of or increasing the punishment for a crime.  *California Dept. of*

4    *Corrections v. Morales*, 514 U.S. 499, 504-05 (1995) (citing *Collins v. Youngblood*, 497 U.S. 37, 41

5    (1990).)  The Ninth Circuit has concluded that "the DSL guidelines require consideration of the same

6    criteria as did the ISL."  *Conner v. Estelle*, 981 F.2d 1032, 1033-1034 (9th Cir. 1992).

7
8    > We agree with the California courts that have considered the issue and hold that the
> application of the DSL parole-suitability guidelines to prisoners sentenced under the ISL
> does not disadvantage them, and therefore does not violate the federal constitutional
> prohibition against *ex post facto* laws.

9

10   *Id*. at 1034 (citing *In re Duarte*, 143 Cal.App.3d 943, 951 (1983), *In re Seabock*, 140 Cal.App.3d 29,

11   40 (1983)); *see Carr v. Perez*, No. 05-1139, slip op at 6, 2007 WL 528720 (E.D.Cal. Feb. 20,

12   2007)("[t]his court is bound to follow *Conner*.").  Accordingly, the BPH's application of DSL guidelines

13   in its analysis of Sesma's suitability for parole did not violate federal law.  As such, the state court's

14   decision denying this claim was neither contrary to, nor an unreasonable application of, clearly

15   established U.S. Supreme Court law, and the claim should be denied.  *Williams*, 529 U.S. at 412-13.

16       **C.**    ***Whether the BPH's Denial of Parole Violated Due Process for Lack of Support in the***

17            ***Record (Grounds II, III, IV & VI)***

18       Petitioner attacks the reasons given by the BPH for finding him unsuitable for parole as violating

19   his due process rights because they were not supported by "some evidence" in the record, and he

20   contends that due process does not permit what he terms "the conversion of [his] prison term to life

21   without the possibility of parole by the continued, interminable preclusion of parole based solely on the

22   unchangeable facts of his commitment offense and prior criminal record."  (Pet. at 26-48.)  Under

23   clearly established federal law, Sesma's due process claim is analyzed in two parts.  First, the Court

24   must determine whether Sesma has a liberty interest of which he has been deprived.  *Kentucky Dep't*

25   *of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  If so, the Court must determine whether the procedure

26   used to deprive him of that liberty interest was constitutionally sufficient.  *Id.*

27       California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners

28   whose sentences provide for the possibility of parole with a constitutionally protected liberty interest

1    in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of

2    the Due Process Clause." *Irons v. Carey*, 479 F.3d 658, 662 (9th Cir. 2007) (*citing Sass v. Calif. Bd.*

3    *of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir.

4    2003); *McQuillon v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002)); *see also Duhaime v. Ducharme*, 200

5    F.3d 597, 600 (9th Cir. 2000) (finding that Ninth Circuit "cases may be persuasive authority for

6    purposes of determining whether a particular state court decision is an 'unreasonable application' of

7    Supreme Court law, and also may help us determine what law is 'clearly established'"). Having

8    determined that Sesma does have a protected liberty interest in a parole date, the Court must proceed

9    to the second, more contentious prong of the due process analysis, whether the procedure afforded

10   Sesma was adequate. *Thompson*, 490 U.S. at 460.

11       In *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), the Ninth Circuit held that

12   the application of the "some evidence" standard to the parole context was clearly established federal law

13   for habeas review purposes. 461 F.3d at 1128-1129. Respondent argues that this Court is not bound

14   by *Sass* because it is neither clearly established U.S. Supreme Court law nor did the Ninth Circuit base

15   its decision on clearly established U.S. Supreme Court law. (Mem. of P. & A. in Supp. of Answer at

16   10-13.) The Court recommends rejecting this argument. In *Sass*, the Ninth Circuit concluded that the

17   Supreme Court's decision in *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985), which

18   held that "revocation of good time [credits] does not comport with 'the minimum requirements of

19   procedural due process,' unless the findings of the prison disciplinary board are supported by some

20   evidence in the record," *Hill*, 472 U.S. at 454, applies with equal force to the denial of parole "because

21   both directly affect the duration of the prison term." *See Sass*, 461 F.3d at 1128-29 (quoting *Jancsek*

22   *v. Oregon Bd. of Parole*, 833 F.3d 1389, 1390 (9th Cir. 1987). Indeed, the Court concluded that the

23   "some evidence" standard was clearly established Supreme Court law for AEDPA purposes. *See Sass*,

24   461 F.3d at 1129; *see also Duhaime*, 200 F.3d at 600. Accordingly, the Court will conduct the due

25   process analysis under the "some evidence" standard as delineated by *Sass*:

26          To determine whether the some evidence standard is met, "does not require examination
            of the entire record, independent assessment of the credibility of witnesses, or weighing
27          of evidence. Instead, the relevant question is whether there is any evidence in the record
            that could support the conclusion reached by [the parole board] . . . .     *Hill's* some
28          evidence standard is minimal, and assures that "the record is not so devoid of evidence
            that the findings of the [parole board] were without support or otherwise arbitrary."

                                                    -8-                                          07cv0539

1  *Sass*, 461 F.3d at 1128-29 (quoting *Hill*, 472 U.S. at 455-57.); *see also Irons v. Carey*, 479 F.3d 658 (9th

2  Cir. 2007).[3]

3     When determining whether "some evidence" supports a denial of parole, "[the] analysis is

4  framed by the statutes and regulations governing parole suitability determinations in the relevant state."

5  *Irons*, 479 F.3d at 662.  Thus, the Court "must look to California law to determine the findings that are

6  necessary to deem a prisoner unsuitable for parole."  *Id.*  The Court must then "determine whether the

7  state court decision holding that these findings were supported by 'some evidence' . . . constituted an

8  unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454 [citation

9  omitted]."  *Id.*

10     California prescribes indeterminate sentences for non-capital murders.  Cal.Penal Code § 190.

11  One year prior to the expiration of a prisoner's minimum sentence, a BPH panel meets with the inmate

12  and "set(s) a release date unless it determines that the gravity of the current convicted offense or

13  offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

14  consideration of the public safety requires a more lengthy incarceration... ."  Cal. Penal Code § 3401(a)

15  & (b).  Regardless of the length of time served, "a life prisoner shall be found unsuitable for and denied

16  parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society

17  if released from prison."  15 Cal. Code Regs. § 2402(a).  California's parole scheme requires that the

18  BPH have "some evidence" that the inmate will be a continuing threat to society in order to deny parole.

19  *See In re Dannenberg*, 34 Cal.4th 1061, 1095 (2005).

20     1.   The BPH Decision and the Superior Court's Decision

21     Following a hearing during which the BPH Commissioners reviewed Sesma's commitment

22  offense, his prior convictions, his prior drug and alcohol abuse, his prison behavior, the therapy he

23  underwent in prison, the vocational training he obtained in prison, prison psychiatric reports, the district

24  ―――――――――――

25     [3] As Ground VI of the Petition, Petitioner asserts that the "some evidence" test is inapplicable
to a review of the BPH's decision and that a "clear and convincing evidence" or "substantial evidence"
26  standard should apply pursuant to *Santosky v. Kramer*, 455 U.S. 745, 767-769 (1982).  (Petition at 49-
52.)  Petitioner reasons that, because the state courts that adopted the "some evidence" standard set out
27  in *Superintendent, Mass. Corr. Inst.  v. Hill*, 472 U.S. 445, 455 (1985) held that prisoners did *not* have
a due process liberty interest in parole, and California inmates *do* have a due process liberty interest in
28  parole, the more deferential standard should no longer apply.  Petitioner provides no Ninth Circuit or
U.S. Supreme Court authority for its assertion, and the magistrate judge recommends rejecting it as well.

07cv0539

1  attorney's statement in opposition to parole, his attorney's statement and Sesma's own statement, the

2  BPH denied Sesma parole:

> The panel has reviewed all information received from the public and relied on the following circumstances concluding the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The offense was carried out in an especially cruel and callous manner. Two people were attacked, injured and killed. The offense was carried out in a dispassionate and calculated manner. The victims were abused and mutilated during the offense. The offense was carried out in a manner, which demonstrates a callous disregard for human suffering. The motive of the crime was inexplicable or very trivial in relationship to the offense. The appellant court basically diagrams a crime that was very brutal. That's about the nicest way you can say it. The individuals were tied up, they were struck with hammers and a shotgun. Basically, just horribly beaten and based upon the information that we have received, the inmate was the individual who perpetrated those crimes. The crime of – the circumstances of the crime itself is sufficient for the denial. Inmate failed to profit from society's previous attempts to correct his criminality including adult probation and cannot be counted upon to avoid criminality. Inmate's institutional behavior, he has not sufficiently participated in self-help or therapy programs. The hearing panel notes that pursuant to 3042, there's opposition by the District Attorney's Office of Orange County regarding the inmate receiving a date. The inmate – the panel makes the following finding, the inmate needs therapy, programming and self-help in order to face, discuss, understand and cope with stress in a nondestructive manner as well as get further insight into the crime. Until progress is made the prisoner continues to be unpredictable and a threat to others. Nonetheless, the prisoner should be commended for – ... [t]hat he's been disciplinary free for almost 30 years, that he's upgraded vocationally including welding, sheet metal, plumbing and mechanics. He's recently working on getting the FEMA Emergency Management Institute, certificates and getting trained in that area and he's gotten excellent work reports. He has not participated in any type of substance abuse that I was able to locate in the C File since 1990 and I know that that's of concern to the Board. These positive factors, though, don't outweigh the factors of unsuitability.

> All right. In a separate decision, the hearing panel finds it's unreasonable to expect that parole will be granted in the next two years. Sir, the last two denials you had were for three years and honestly if you continue your position that you do not have a drug problem and that you're going to seek help in regards to that area, it will be a problem for you in the future. It isn't as though AA and NA are the only programs in the world, it just happens to have the best track record and if somebody came out with a better track record, we would let you guys go to that one. But that problem is that (indiscernible) drugs are tied up in this whole situation, but even beyond that you have the problem that your last 115 – the last time you got into trouble was in regards to drugs. So you know the consequences, we can only make the recommendation to you. It's totally up to you. The reason for the multiple year denial is that multiple victims were attacked, injured and killed. This was carried out in a dispassionate and calculated manner, this was not a random occurrence. The victim was abused and mutilated.. I think that particularly fits in this particular case. I don't know exactly how you describe being hit over the head with a hammer. The offense was carried out in a manner, which demonstrates an exceptional callous disregard for human suffering. I guess in the backwards ways, people can argue, well he didn't bury him alive, he shot him in the head. The motive for the crime was inexplicable and very trivial in relationship to the offense. The prisoner has not completed necessary programming, which is essential to his adjustment and additional time to gain such programming is necessary. I will indicate to you that another reason for the multiple year denial is that your parole plans are just basically unsubstantiated. I guess that's the best way to word it because I don't doubt when Mr.

Hall tells me that you (indiscernible) because I don't see any reason for you not to have sent for your parole plans. But on the other hand you know and I know that I can't take your word for it. It doesn't work that way and if it went up to the Governor, it would get kicked back right away. So you've got two years to get it together, all right? The panel recommends that the inmate remain disciplinary free and participate in self-help and therapy programs if available.

(Hrg. Trans. at 27-31.)

The Superior Court upheld the BPH's decision on collateral review:

**Insufficient Support in the Record for Finding of Parole Unsuitability**

[¶] Petitioner asserts that there is no evidence in the record to support the Board's finding that he is unsuitable for parole. He concedes that there were multiple victims and that the offenses were committed in a cruel and callous manner. However, he disputes the finding that the motive was trivial or inexplicable, claiming that any motive could be termed trivial in relation to murder, and that his motive was explicable because the victims had planned to kidnap the family of codefendant Solis. Petitioner also claims that no evidence supports the Board's finding that his prior criminal record demonstrates his failure to profit from society's previous attempts to correct his criminality, or the finding that [he] needs self-help and therapy. And he further contends that the Board's reliance on the static factors of the commitment offense constitutes a denial of due process, in that it effectively amends his prison term to a sentence of life without parole.

**Standard of Review**

[¶] Pen.C. § 3041(b), which provides that the Board of Prison Terms shall set a release date, also allows it to decline to do so if it determines that the commitment offense is such that public safety considerations require a longer period of incarceration. In arriving at its decision, the Board must consider "the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offense, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. (Title 15 Cal. Code of Regulations § 2402(b))

[¶] Once it has considered all relevant factors, the Board's discretion in determining parole is extremely broad and almost unlimited, but not absolute. (In re Dannenberg (2005) 34 C4th 1061 at 1082; In re Rosenkrantz (2002) 29 Cal.4th 616, 655; In re Powell (1988) 45 Cal.3d 894, 902) The Board's decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. However, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Board. If the decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is *some* evidence in the record that supports the decision. (*In re Rosenkrantz*, (2002) 29 Cal.4th 616, at 677.)

[¶] The transcript of the 11/7/05 parole suitability hearing indicates that the BPT considered all the above factors required by law, including but not limited to the following positive factors: Petitioner has been disciplinary free for almost 30 years, he has upgraded vocationally, in the areas of welding, sheet metal, plumbing and

mechanics, and is currently working on FEMA Emergency Management Institute certificate. However the Board found these positive factors insufficient to outweigh the factors of unsuitability.

[¶] The Board's determination of unsuitability was supported by "some evidence", and constitutes neither an abuse of discretion nor a denial of due process. (In re Rosenkrantz (2002) 29 Cal.4th 616, 658)  The finding that the commitment offense was carried out in a cruel, callous, dispassionate and calculated manner, with a demonstrated disregard for human suffering is supported by evidence in the record which showed that petitioner, acting as a hired killer, helped to lure the two victims to their deaths, personally beat one of them to death with a gun, and then shot the other, who had somehow survived an extremely severe beating at the hands of a co-defendant.  The Board's finding that petitioner remains too dangerous to be paroled based on the nature of the commitment offense alone, is based on facts which exceed the minimum elements of the commitment offenses, is supported by some evidence, and therefore conforms to existing law.  (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071; Pen. Code, § 3041(b); Cal. Code of Regs., tit. 15, § 2402(b) and (c)(1)(A)(B)(C)(D)(E).)

[¶] The Board's other findings, while not as strongly supported, still find some support in the evidence.  The finding that petitioner has failed to profit from society's previous attempts to correct his criminality based on his prior adult criminal history has some evidentiary support, based on his history of convictions for transporting a stolen vehicle, carrying a concealed weapon in a vehicle and possession of a switchblade.  In addition, the finding that petitioner has not sufficiently participated in self-help or therapy programs, is also less than strong, especially in light of his favorable psychological reports.  Nevertheless, because drugs were a factor in the commitment offense, because petitioner had an early prison disciplinary violation involving drugs, and because the record shows that he has not participated in any substance abuse programs since 1990, the Board's finding had some evidentiary support.  Further, the opposition of the Orange County District Attorney's opposition was properly considered, as the Board is statutorily required to consider such input when determining the parole suitability of a particular inmate.  (See, Pen. Code § 3041.7; § 3042(h); § 3046(c); see also Cal. Code of Regs., tit. 15, § 2402(b).)

[¶] Where, as here, the Board's decision is supported by "some evidence", it need not engage in an inter-case comparison review, as long as it applies relevant standards, relies on factors beyond the minimum elements of the commitment offense. (In re Dannenberg (2005) 34 Cal.4th 1061, 1071)

(Lodgment No. 7 at 4-5.)

2.   <u>Factors Related to the Commitment Offenses</u>

Sesma argues that the denial of parole on the basis of factors related to his commitment offenses violated his federal due process rights.  He points to several errors in the BPH's decision: (a) the only reliable evidence before the panel that addressed Sesma's parole suitability and the risk to public safety in a contemporaneous way was the psychological examinations by the board's forensic experts, and the panel ignored them; (b) the panel's findings regarding the offense factors were unsupported by the record; (c) the panel's findings regarding Sesma's prior record were unsupported by the record; and (d)

the panel's findings that Sesma needs self-help and therapy were unsupported by the record.  (Pet. at 26-31.)  Respondent argues that the BPH's findings denying Sesma's parole were supported by some evidence and that the state court's denial of his due process claims should be upheld.  (Mem. of P. & A. in Supp. of Answer at 8-11.)

As previously noted, when determining whether "some evidence" supports a denial of parole, "[the] analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state."  *Irons*, 479 F.3d at 662.  California law permits the BPH to consider the facts surrounding the commitment offense in determining whether a prisoner is too dangerous to parole.  *Dannenberg*, 34 Cal. 4th at 1071.  However, as the Ninth Circuit has noted:

> [T]he denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.  *Dannenberg*, 34 Cal. 4th at 1071 [citations omitted].  Factors beyond the minimum elements of the crime include, *inter alia*, that '[t]he offense was carried out in a dispassionate and calculated manner,' that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Cal. Code Regs., tit. 15 § 2402(c)(1)(B), (D)-(E).

*Irons*, 479 F.3d at 663; *see also Rosencrantz*, 29 Cal. 4th at 678-79.

The Ninth Circuit has suggested in dicta, however, that while the BPH can look at immutable events, such as the nature of the commitment offense, to predict that a prisoner is not currently suitable for parole, in order to comply with federal due process guarantees the weight to be attributed to such events should decrease over time and as the prisoner demonstrates good behavior in prison.  *See Biggs*, 334 F.3d 910; *Sass*, 461 F.3d 1123; *Irons*, 479 F.3d 658.  Indeed, the Court has noted that "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."  *Irons*, 479 F.3d at 665.

Despite the Ninth Circuit's suggestions, however, "[t]here is no 'clearly established federal law, as determined by the Supreme Court of the United States,' that limits the number of times a parole board may deny parole to a murderer based on the brutality and viciousness of the commitment offense."  *Culverson v. Davison*, No. 06-56827, slip op. at 1, 2007 WL 1663682 (9th Cir. June 8, 2007) (quoting

-13-

07cv0539

1    28 U.S.C. 2254(d)); *see also Kunkler v. Muntz*, No. 06-55555, slip op. at 4-5 (9th Cir. Mar. 7, 2007).[4]

2    Accordingly, this Court cannot conclude that the use of Sesma's commitment offense alone to deny

3    parole entitles him to relief.  *See Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (holding that "[i]f

4    no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas

5    petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable

6    application of clearly established federal law.")  Rather, this Court is limited to determining "whether

7    the state court decision holding that the [BPH's] findings were supported by 'some evidence' . . .

8    constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*."  *Irons*, 479

9    F.3d at 662.  As previous noted, "*Hill*'s some evidence standard is minimal, and assures that 'the record

10   is not so devoid of evidence that the findings of the [parole board] were without support or otherwise

11   arbitrary."  *Sass*, 461 F.3d at 1128-29.

12       In Sesma's case, there was "some evidence" to support the BPH's denial of parole: That the

13   offense was carried out in an especially cruel and callous manner is supported by the fact that Sesma,

14   acting as a hired killer, "beat [one victim] so severely about the head with a shotgun that the gun was

15   broken."  (Lodgment No. 3 at 3.)  When it was discovered (after transporting the bodies in the trunk of

16   Sesma's Cadillac) that the second victim was not yet dead, "Sesma then shot him in the head with a .22

17   caliber pistol."  (*Id*. at 4.)  That Sesma failed to profit from society's previous attempts to correct his

18   criminality is supported by his adult criminal record consisting of transporting a stolen vehicle, carrying

19   a concealed weapon in a vehicle and possession of a switchblade. (Hrg. Trans. at 6.)  That Sesma needs

20   self-help and therapy is supported by the fact that, even though he was in possession of marijuana in

21   prison in 1977 ("he apparently had swallowed a balloon containing hash oil, which became lodged in

22   his throat and had to be removed") and he was found to have possessed/manufactured alcohol in prison,

23   he stated at the hearing "I have no interest in [Narcotics Anonymous] or [Alcoholics Anonymous]."

24   (Hrg. Trans. at 6, 10, 13.)

25       Moreover, the fact that the BPH apparently gave very little weight to the psychological

26   examinations by the board's forensic experts, which have strongly urged parole since 1991, will not

27

28       [4]  Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007.  (*See* Ninth Cir. Rule 36-3.)  Although still not binding precedent, unpublished decisions have persuasive value and indicate how the Ninth Circuit applies binding authority.

1   sustain Petitioner's claim that the denial violated due process.  The panel did discuss the psychological

2   report that was done for the hearing and acknowledged that "over the years [Sesma's] – psychological

3   reports have shown a steady pattern [of] improvement in terms of insight and maturity."  (Hrg. Trans.

4   at 16-18.)  However, the board found that this and other positive factors did not "outweigh the factors

5   of unsuitability." (*Id.* at 29.)   Again, because there is no clearly established U.S. Supreme Court law

6   "that limits the number of times a parole board may deny parole to a murderer based on the brutality and

7   viciousness of the commitment offense," the Court cannot conclude that the BPH's denial of parole was

8   a violation of due process.  *Culverson v. Davison, supra*, 2007 WL 1663682 at 1; *see Brewer v. Hall*,

9   *supra*, 378 F.3d 952 at 955.

10          3.      The "conversion" of Sesma's prison term to life without the possibility of parole.

11          Petitioner contends that, by continuing to deny him parole "based solely on the unchangeable

12   facts of his commitment offense and prior criminal record," the BPH has essentially converted his

13   sentence to life without the possibility of parole in violation of due process.  (Pet. at 32-48.)

14          Taken together, *Biggs*, *Sass* and *Irons* suggest that although the BPH can consider immutable

15   events, such as the nature of the conviction offense, when deciding whether to parole an individual, the

16   weight to be attributed to such events should decrease over time and as a predictor of future

17   dangerousness.  *See Biggs*, 334 F.3d at 916-17; *Sass*, 461 F.3d at 1129; *Irons*, 479 F.3d at 665.  This is

18   particularly true when a prisoner, like Sesma, demonstrates virtually discipline-free behavior in prison,

19   acquisition of marketable skills, acceptance of responsibility, demonstration of remorse and realistic

20   parole plans.  *Biggs*, 334 F.3d at 916-17; *Irons*, 479 F.3d at 665.  Indeed, the Northern and Central

21   Districts have applied *Biggs*, *Sass* and *Irons* to reverse both BPH denials of parole and the Governor's

22   reversals of BPT's decisions granting parole.  *See Brown v. Kane*, No. C 05-5188, 2007 WL 1288448

23   (N.D. Cal. May 2, 2007); *Willis v. Kane*, No. C 05-3153, 2007 WL 1232060 (N.D. Cal. April 26, 2007);

24   *Martin v. Marshall*, 431 F. Supp. 2d 1038 (N.D. Cal. May 17, 2006); *Rosencrantz v. Marshall*, 444 F.

25   Supp. 2d 1063 (C.D. Cal. Aug. 1, 2006).

26          Nevertheless, this Court's review is restricted by AEDPA, and, in the final analysis, whether this

27   Court agrees or disagrees with the BPH's denial of parole or whether this Court, in its independent

28   judgment, concludes that Sesma should be granted parole, is irrelevant.  This Court is only charged with

1   determining whether the state court's affirmance of the BPH's decision was contrary to or an

2   unreasonable application of clearly established Supreme Court law.  *Williams v. Taylor*, 529 U.S. 362,

3   403 (2000).  As previously stated, because "[t]here is no 'clearly established federal law, as determined

4   by the Supreme Court of the United States,' that limits the number of times a parole board may deny

5   parole to a murderer based on the brutality and viciousness of the commitment offense," this Court

6   cannot conclude that the state court's denial of Sesma's due process claims was an unreasonable

7   application of the "some evidence" standard of *Hill*.  *See Culverson*, No. 06-56827, slip op. at 1, 2007

8   WL 1663682; *see also Kunkler*, No. 06-55555, slip op. at 4-5; *Brewer*, 378 F.3d at 955.

9         **D.    *Whether Deferring Petitioner's Next Parole Hearing for an Extra Year Violated Due***

10            ***Process (Ground V)***

11         The BPH issued a two-year denial of parole at Sesma's hearing.  (Hrg. Trans. at 29-31; *see*

12   § IV.C.1. *infra*.)  Sesma contends that, because the BPH stated no rational ground why he cannot be

13   found suitable for parole in one year, its decision to schedule his next parole hearing in two years is

14   arbitrary and violates due process.  (Pet. at 48-49.)  The Superior Court upheld the BPH's decision on

15   collateral review:

16         **Challenge to the Two-Year Denial**

17         [¶] Separate from its finding of unsuitability, the Board found it unreasonable to expect
         that parole would be granted in the next two years, noting that petitioner's last two
18         denials had been at three-year intervals.  Its reasons for the two-year denial were (1) the
         commitment offense factors (cited above), which were used to find petitioner unsuitable
19         for parole; (2) petitioner's continued assertion that he did not have a drug problem and
         his ensuing lack of participation in NA and AA; and (3) his unsubstantiated parole plans,
20         which the record indicates had apparently not been updated prior to the hearing.
         Petitioner challenges these findings, claiming that they were largely identical to the
21         reasons for the suitability denial, were unsupported by the evidence, and are therefore
         arbitrary and a violation of petitioner's due process rights.

22
         [¶] Although suitability hearings are generally required to be performed annually, the
23         board may, after denying parole, schedule the next suitability hearing two years later, if
         it states the basis for its reasons and finds that it is not reasonable to expect that parole
24         would be granted at a hearing during the following year.  (Pen.C. § 3041.5, subd.
         (b)(2)(A)).  As long as the record indicates that the issue was separately considered, the
25         reasons for the two-year denial may be based on the same facts as those given for the
         parole suitability denial.  (In re Jackson (1985) 39 C3d 464, 478-479)  In the present
26         case, the Board's statement of reasons for postponing petitioner's next hearing date
         contained the requisite statement of reasons, which, like those supporting the
27         unsuitability determination, was supported by "some evidence".

28   (Lodgment No. 7 at 5-6.)

07cv0539

1    Cal. Penal Code § 3041.5(b)(2)(A) states: "The board shall hear each case annually ..., except

2  the board may schedule the next hearing no later than the following: Two years after any hearing at

3  which parole is denied if the board finds that it is not reasonable to expect that parole would be granted

4  at a hearing during the following year and states the bases for the finding." The statute goes on to state

5  that a subsequent hearing may be scheduled up to five (5) years after the previous denial of parole "if the

6  prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole

7  would be granted at a hearing during the following years and states the bases for the finding in writing."

8  Cal. Penal Code § 3041.5(b)(2)(B). As noted by the superior court, a BPH panel may issue a two-year

9  denial based on the same factors as it based unsuitability as long as it is clear from the record that the

10  issue was considered separately. The panel considered the issue separately here, and Sesma cannot show

11  that the state court violated clearly established U.S. Supreme Court law in upholding the BPH's two-year

12  denial on collateral review.

13  **IV. CONCLUSION**

14    Based on the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the

15  Petition for Writ of Habeas Corpus be **DENIED**. This report and recommendation is submitted to the

16  United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

17    **IT IS ORDERED** that no later than ***September 24, 2007***, any party to this action may file written

18  objections with the Court and serve a copy on all parties. The document should be captioned "Objections

19  to Report and Recommendation."

20    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

21  served on all parties no later than ***October 12, 2007***. The parties are advised that failure to file objections

22  within the specified time may waive the right to raise those objections on appeal of the Court's order.

23  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

24    **IT IS SO ORDERED**.

25  DATED: August 27, 2007

26                                        _____
                                          Jan M. Adler
27                                        U.S. Magistrate Judge

28

07cv0539